IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TIMOTHY LOGSDON,

        Plaintiff,

                                         CV 09-3004-PK

                                         OPINION AND
v.                                        ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

PAPAK, Magistrate Judge:

        Plaintiff Timothy Logsdon filed this action January 26, 2009, seeking judicial review of a

final decision of the Commissioner of Social Security denying his application for disability

insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). This court has

jurisdiction over Logsdon's action pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

        Logsdon argues that the Commissioner erred when he discredited the opinions and

Page 1 - OPINION AND ORDER

ultimate conclusions of one of Logsdon's treating physicians, when he discredited Logsdon's testimony regarding his pain symptoms, when he discredited the lay opinion testimony of Logsdon's wife, and when he concluded that Logsdon was capable of performing jobs existing in significant numbers in the national economy.  I have considered all of the parties' briefs and all of the evidence in the administrative record.  For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded to the Commissioner for award of disability insurance benefits.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration.  *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4).  At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner.  *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any.  *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 404.1520(a)(4)(i).  If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).  Otherwise, the evaluation will proceed to the second step.

Page 2 - OPINION AND ORDER

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical

and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments.  *See* 20 C.F.R. § 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

 At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(a)(4)(iv).  If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f).  In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level.  20 C.F.R. § 404, Subpt. P, App. 2.  The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made.  In the event the grids do not mandate a finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy.  *See Bowen*, 482 U.S. at 142;  *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566.  If the Commissioner meets his burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in

---

[1]  "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Logsdon was born February 9, 1959. Tr. 77.[2] He has earned a GED certification, but has not completed any further educational program or vocational training. Tr. 96-97, 459. In the summer of 1984 he worked as a logger, from 1988 to 1992 he worked as a part-time landscaper, from 1992 to 2004 he performed occasional landscaping work, for most of 1995 he worked full time in RV sales, and for the summer of 2004 he worked approximately three-quarters time on a seasonal basis in RV sales. Tr. 114-117, 459-462.

On September 7, 2005, Logsdon filed an application for Title II disability insurance benefits, alleging a disability onset date of August 28, 2004. Tr. 77-82. On September 28, 1984, while working as a logger, Logsdon had been involved in an accident in which he narrowly avoided being crushed by a rolling log, and in the process injured his back. Tr. 396. He underwent lumbar fusion surgery in 1993 to alleviate resulting back problems. Tr. 396. His medical records reflect that since the 1993 surgery he has reported constant, generally increasing back pain, accompanied by migraine headaches of increasing frequency. Tr. 396. As of the date of his DIB application, Logsdon reported his back pain at 7-9 on a 10 point scale, and 2-4 migraine headaches per day. It is his position that his back pain and migraine headache pain make it impossible for him to work.

On December 22, 2005, the Social Security Administration found Logsdon not disabled in connection with his application for DIB. Tr. 52-56. Logsdon timely requested reconsideration on February 22, 2006. Tr. 57-58. On May 19, 2006, examiner Richard Alley, M.D., reviewed

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 13.

Logsdon's medical records and recommended that the Administration affirm Logsdon's previous residual functional capacity assessment on reconsideration.  Tr. 255-256.  On May 22, 2006, the Administration affirmed its previous finding of no disability.  Tr. 51, 59-61.

On July 25, 2006, Logsdon requested a hearing in front of an Administrative Law Judge. Tr. 62.  The hearing was held on February 1, 2008.  Tr. 453-488.  The ALJ heard testimony from Logsdon, Tr. 458-474, 479-480, Logsdon's wife Cindy, Tr. 475-480, and a vocational expert, Tr. 481-486.  The ALJ issued an opinion denying Logsdon's DIB application on March 25, 2008.  Tr. 31-33, 34-42.  Logsdon timely requested review of the ALJ's decision.  Tr. 28-30.

On November 21, 2008, the Social Security Administration denied Logsdon's request for review of the ALJ's decision.  Tr. 5-7.  In consequence, the ALJ's decision became the agency's final order for purposes of judicial review.  *See* 20 C.F.R. § 422.210(a); *see also*, *e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 (2000).  This action followed.

## CLAIMANT MEDICAL HISTORY

Logsdon's medical history is extensive, and many of the records are simply not germane to the dispute now before the court.  Because so many of the records are immaterial to the legal analysis described below, I do not summarize the records within the body of this Findings and Recommendation, and instead provide a summary in Appendix I hereto.  Specific medical findings are described below where relevant to my analysis and recommendations.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found in his March 25, 2008, opinion that Logsdon did not engage in substantial gainful activity at any time following his alleged onset date of August 28, 2004.  Tr. 36.  He therefore

Page 7 - OPINION AND ORDER

proceeded to the second step of the analysis.

At the second step, the ALJ found that Logsdon's medical impairments of degenerative disc disease status post lumbosacral fusion and migraine headaches were "severe" for purposes of the Act.  Tr. 36.  Because the combination of impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Logsdon's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1.  Tr.  37.  The ALJ therefore properly conducted an assessment of Logsdon's residual functional capacity. Specifically, the ALJ found that Logsdon had "the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except that he is limited to only occasional postural activities."  Tr. 37.  In reaching this conclusion, the ALJ considered all of the objective medical evidence in the record, as well as Logsdon's own statements and those of his wife as to his ability to perform the activities of daily living and as to the frequency and intensity of his pain and other symptoms.  Tr. 36-40.

At the fourth step of the five-step process, the ALJ found in light of his RFC that Logsdon was able to perform his past relevant work as an RV salesperson, albeit unable to perform his past relevant work as a landscape gardener.  Tr. 40.

Despite finding that Logsdon was able to perform past relevant work, the ALJ proceeded to the fifth step of the process.  At the fifth step, the ALJ found in light of Logsdon's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that he could perform.  Tr. 40-41.  Relying in part on the testimony of an objective vocational expert, the ALJ cited as examples of light, unskilled jobs that Logsdon

could perform, despite the limitations listed in his RFC, occupations including outside deliverer, information clerk, and office helper. Tr. 41. Based on these findings, the ALJ concluded that Logsdon was not disabled as defined in the Act at any time between August 28, 2004, and March 25, 2008. Tr. 41.

## ANALYSIS

Logsdon challenges the Commissioner's assessment of his residual functional capacity at the third step of the five-step sequential evaluation process. Specifically, Logsdon argues that the Commissioner improperly rejected the opinion of his treating physician, Marcel Wiggers, M.D., as well as other medical sources, that the Commissioner improperly rejected Logsdon's lay opinion testimony, and that the Commissioner improperly rejected the lay opinion testimony of Logsdon's wife, Cindy.

Logsdon further argues that the Commissioner failed to carry his burden at the fifth step of the five-step process in light of the alleged errors in his assessment of Logsdon's RFC, by failing to include all of Logsdon's limitations in his hypothetical questions to the vocational expert.

## I.    Step Three:  Assessment of Residual Functional Capacity

### A.    Opinion of Treating Physician Dr. Wiggers

Marcel Wiggers, M.D., was Logsdon's treating physician for back pain, migraine headaches, and other medical conditions from March 6, 2007 (subsequent to the date the Administration found Logsdon not disabled on reconsideration, but prior to the date of the hearing before the Administrative Law Judge), through the latest date for which medical records are available. Tr. 396-397, 431-435. On July 23, 2007 (also prior to the hearing before the ALJ),

Dr. Wiggers signed off on a summary assessment of Logsdon's condition written by Logsdon's

counsel stating that:

> '[F]ailed back surgical syndrome' . . . [is] a reasonable medical explanation for the
> source of [Logsdon]'s back pain.  [Logsdon]'s pain . . . [is] of sufficient severity to
> subject him to the need to lie down as a pain strategy on an unpredictable
> basis. . . .  [I]f placed in a vocational or work environment, [Logsdon would
> likely] miss several days a month and/or have to go home early on an
> unpredictable basis and have attendance problems.

Tr. 383-384.  In addition, on November 10, 2008 – following the hearing before the ALJ, but

prior to the Commissioner's final disability decision – Dr. Wiggers wrote a letter summarizing

his assessment of Logsdon's physical residual functional capacity:

> The patient had an accident in the 1980s.  He underwent a lumbar fusion in 1993.
> In 1994 he developed failed back syndrome, but was able to continue working for
> about 2½ days a week.  He had a severe worsening in 2004.  He had pain, fatigue,
> depression, headache, migraines, and muscle spasms.  He describes low back pain
> with radiating symptoms to both legs and lumbar paravertebral muscle spasms.  I
> do not believe the patient is a malingerer, but emotional factors do contribute to
> the severity of the patient's symptoms.  I think that is largely due to his loss of
> abilities, both in terms of job skills and even some activities of daily living.  He
> needs some help with dressing in the morning.  He finds that he has to lie down
> approximately four times daily, from 1 to 2 hours at a time.  I think the depression
> is secondary to his back pain and not primary.  He describes that he is in constant
> pain, but is able to sit up for 15 minutes and stand up to 10-15 minutes.  Certainly
> able to sit and stand less than 2 hours daily.  He walks with a cane and needs
> frequent position changes throughout the day including supine position.  With
> regards to whether the patient's leg should be elevated, he finds it helpful at times
> to lie on the floor with his feet on a chair or couch to relieve some of the pain in
> his low back.  I think that he should be limited to lifting and carrying 10 pounds
> only occasionally, rarely 10 pounds, and should not lift items greater [*sic*] than
> that.  He does not have any significant restrictions in terms of neck function or
> upper extremity function.  I think it is primarily related to his low back.  He
> should not twist, stoop, crouch, climb ladders, or climb stairs.  I think this
> certainly affects him more than 4 days monthly; in fact, it affects him daily.

Tr. 451.[3]  On that same day, Dr. Wiggers filled out a Physical Residual Functional Capacity

Questionnaire regarding Logsdon's condition, opining that Logsdon's pain symptoms would

constantly interfere with ability to perform even simple work tasks, and that Logsdon is incapable

of even low stress jobs.  Tr. 431-435.  Thus, the ALJ rejected Dr. Wiggers' opinions that Logsdon

is incapable of performing simple work tasks and low stress jobs, that Logsdon was unable to sit

and stand for more than two hours daily, and that Logsdon was required to lie down four times

daily for one to two hours at a time.

In weighing a claimant's medical evidence, the Commissioner generally affords enhanced

weight to the opinions of the claimant's treating physicians.  *See* 20 C.F.R. § 404.1527(d)(2).

Indeed, where a treating physician's medical opinion is well supported by diagnostic techniques

and is not inconsistent with other substantial evidence in the medical record, the treating

physician's opinion is accorded controlling weight.  *See id.*  Moreover, even where a treating

physician's opinion is contradicted by competent medical evidence, it is still entitled to deference.

*See id.*; *see also*, *e.g.*, *Orn v. Astrue*, 495 F.3d 625, 631-632 (9th Cir. 2007) (where a treating

physician's opinion is contradicted by medical evidence in the record it is "still entitled to

deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527"), *quoting*

S.S.R. No. 96-2p, 1996 SSR LEXIS 9.  An uncontradicted treating physician's opinion may

---

   [3]  This court may properly consider Dr. Wiggers' letter, despite the fact that it was not
considered by the ALJ, because the Appeals Council had the benefit of the letter when it denied
Logsdon's request for review.  *See Harman v. Apfel*, 211 F.3d 1172, 1180 (9th Cir. 2000), *citing
Ramirez v. Shalala*, 8 F.3d 1449 (9th Cir. 1993).

therefore only be rejected for "clear and convincing" reasons supported by evidence in the record, and a contradicted treating physician's opinion may only be rejected for "specific and legitimate" reasons supported by evidence in the record.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998), *citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

No such deference is afforded a treating physician's opinion as to the ultimate issue of a claimant's disability or as to any other issue reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(e); *see also* S.S.R. No. 96-5p, 1996 SSR LEXIS 2.  Medical opinions from a treating physician or any other source may never be simply ignored, even when they bear upon issues reserved to the Commissioner, but rather must be evaluated to determine the extent to which they are supported by evidence in the record.  *See* S.S.R. No. 96-5p, 1996 SSR LEXIS 2. Nevertheless, although the Commissioner is required to evaluate every medical opinion, the Commissioner is only required to discuss "significant probative evidence" in his detailed findings.  *Vincent on behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984) (controverted medical opinion found to be neither significant nor probative), *quoting Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981).

Here, the ALJ did not have the benefit of Dr. Wiggers' statements of November 10, 2008, at the time his decision issued, but his detailed findings expressly addressed Dr. Wiggers' statement of July 23, 2007.  The ALJ indicated that he rejected Dr. Wiggers' opinion to the extent inconsistent with the ALJ's assessment of Logsdon's physical residual functional capacity because Dr. Wiggers' opinion was not based on supporting clinical or diagnostic findings or a specific functional assessment, because his opinion was inconsistent with other medical findings and opinions of record, because of indicia that Logsdon's self-reports of the severity of his pain

Page 12 - OPINION AND ORDER

symptoms were inconsistent, and because of indicia of drug-seeking behavior on Logsdon's part. Tr. 40.

It is clear that Dr. Wiggers' opinion is contradicted by other medical opinions within the record, chiefly those of the Administration's consultative disability examiners Drs. Eder and Sorweide.  Nevertheless, Dr. Wiggers' conclusion that Logsdon suffered from failed back syndrome is supported by diagnostic techniques (namely, by imaging studies calling into question the success of Logsdon's back surgery, Tr. 422, 242, 239-240), although his conclusion that the severity of Logsdon's pain symptoms was disabling is necessarily supported essentially exclusively by Logsdon's self-reports (albeit consistent self-reports over a decade of medical records and numerous health care providers).  The ALJ therefore needed to cite "specific and legitimate" reasons supported by evidence in the record to properly reject Dr. Wiggers' opinion. *See Reddick*, 157 F.3d at 725.

Analysis of Dr. Wiggers' chart notes indicates that, as stated by the ALJ, his findings were based on prior imaging studies and on Logsdon's own self-report of symptoms, rather than on independent medical findings or diagnoses, the exceptions to this generalization being Dr. Wiggers' inability to elicit a left patellar reflex on March 6, 2007, Tr. 397, and findings of lumbar muscle spasms on June 1 and 29, 2007, Tr. 391, 390.  The Administrative Law Judge concluded that Logsdon "complains of significant pain of which there is no medical reason," Tr. 38, a clear rejection of Dr. Wiggers' conclusion that Logsdon suffers from failed back surgical syndrome. However, the ALJ also found that Logsdon was severely impaired by degenerative disc disease and by migraine headaches, so the crux of the disability determination is the *severity* of Logsdon's pain symptoms rather than their *etiology*, and assessment of the severity of pain

symptoms is necessarily dependent on a determination of the credibility of the sufferer's self-reports. Therefore, in order to properly reject Dr. Wiggers' medical opinion, the ALJ was required to cite specific and legitimate reasons, supported by evidence in the record, to doubt the credibility of Logsdon's reports to Dr. Wiggers and to his other treating physicians regarding the severity of his pain.

The "inconsistent findings and opinions of record" cited by the ALJ among his reasons for rejecting Dr. Wiggers' opinion are as follows. First, Logsdon repeatedly reported to his physicians that the fusion at L5-S1 was broken, not solid, or exhibited unsuccessful union, whereas several imaging studies indicated successful union. Tr. 37. The ALJ's observation is correct, as imaging studies were interpreted to display successful fusion at the L5-S1 level on March 15, 1995, Tr. 423-424, April 10, 2003, Tr. 235, April 24, 2003, Tr. 217, January 3, 2005, Tr. 241, 380-381, and June 16, 2006, Tr. 411, 374-375. However, other imaging studies were wholly consistent with Logsdon's belief that the L5-S1 fusion had failed, as, for example, the CT scan of March 17, 1995 ("fusions are inadequate bilaterally"), Tr. 422, and the X-ray study of December 16, 2004 ("fusion mass with uncertain status regarding possible bridging of the interval"), Tr. 242; moreover, Logsdon's treating physician, Dr. Peterson, assessed Logsdon with "probable nonunion, lumbosacral fusion," Tr. 239-240. Although under the applicable standard of review this court would not disturb the Commissioner's finding, if one had been made, that Logsdon's lumbosacral spine exhibited successful fusion at the L5-S1 level, on the basis of competent supporting evidence and despite the existence in the record of contradictory evidence, no such finding is here at issue. Instead, the ALJ cited Logsdon's reliance on certain contradicted medical evidence as affirmative evidence that Dr. Wiggers' opinion could properly be rejected.

Page 14 - OPINION AND ORDER

However, Logsdon's belief that his 1993 back surgery had not produced a successful lumbosacral union, based as it is on competent evidence in the record, simply does not call Dr. Wiggers' diagnoses or opinions into question, and therefore does not constitute a "specific and legitimate" reason supported by evidence in the record for properly rejecting Dr. Wiggers' opinion.

Second, the ALJ noted that although Logsdon claimed an onset date of August 28, 2004, for his disability, "treatment notes surrounding the claimant's alleged onset date reflect that the claimant reported his symptoms of pain were under reasonable control and he was looking for work in RV sales." Tr. 38. Indeed, it appears certain that the alleged onset date was selected not as coincident with any medically significant event, but rather with the date Logsdon was laid off from his job as an RV salesperson, following an argument with a manager, approximately two weeks before the position was scheduled to terminate for seasonal reasons. Tr. 459-462. However, the fact that the medical evidence suggests that Logsdon's pain symptoms fluctuated in intensity over time, again, does not call Dr. Wiggers' opinion into question and fails to constitute a specific and legitimate reason for properly rejecting it.

Third, the ALJ noted that Logsdon is frequently described in his physicians' chart notes as "in no acute distress," and that in December 2004 he was found able to move about satisfactorily and to heel-toe rise. Tr. 38. However, these facts of record are not in any way inconsistent with Logsdon's reports of chronic pain exacerbated by remaining too long in one position, and are not sufficient to constitute a specific and legitimate reason for rejecting Dr. Wiggers' medical opinion.

Fourth, the ALJ cited the opinions of Derrick Sorweide, D.O., the Administration's consultative disability examiner, that Logsdon's "level of functioning is higher than he lets on"

Page 15 - OPINION AND ORDER

and that he "had several inconsistent findings showing me a level of dishonesty, Tr. 243.  Tr. 38.

However, Dr. Sorweide provided only one piece of evidence in corroboration of his opinion:  his

"belie[f]" that Logsdon did not give maximum effort in a test of lumbar spine flexion.  Tr. 243.

This corroborating evidence is of dubious utility at best, since failure to exhibit signs of

"maximum effort" in flexing the lumbar spine is entirely consistent with Logsdon's position that

he is subject to severe and debilitating back pain.  Moreover, as a treating physician, Dr. Wiggers'

opinion is entitled to greater deference than that of Dr. Sorweide, a consultative examining

physician.  The ALJ therefore erred to the extent he relied on Dr. Sorweide's opinion to reject

that of Dr. Wiggers.

Finally, the ALJ concluded that the "record demonstrates multiple instances of lost,

stolen, or flushed medications in need of early refills, indicating the existence of a serious drug

seeking component [*sic*]."  Tr. 39.  This conclusion is, at best, disingenuous.  First, the only

report of a "lost" medication was the report that Logsdon had lost a *prescription* for pain

medications, rather than the medications themselves, and his request for a replacement

*prescription*, as opposed to any form of request for additional *medications*.  Tr. 362.  Naturally,

had Logsdon filled both the allegedly lost prescription and the replacement, a red flag would

have been raised, but this did not occur.  Second, there was only a single report of medications

being stolen, not "multiple instances" of stolen medications.  Tr. 351.  Third, of the two reported

instances of flushed medications, one took place within the prescribing clinic, in the presence of

witnesses, in connection with a request for a new brand of medication, Tr. 359, whereas the other

took place in connection with a request for a *reduced* dosage of OxyContin, Tr. 354, 353,

significantly undercutting the suggestion that the occurrences were examples of drug-seeking

behavior.

In addition to the foregoing, the ALJ cited to a drug screen negative for OxyContin, Tr. 379, as evidence that Logsdon may have been selling his medications rather than taking them as prescribed.  Tr. 39.  However, a rescreen the following week was positive for OxyContin, Tr. 376, 378, consistent with Logsdon's theory that the first test was the result of laboratory error. Indeed, the second test was positive for cannabinoids as well as for OxyContin, whereas the first test was negative for both:  given Logsdon's concession that he was smoking marijuana at the time, the absence of a positive result for cannabinoids in the first test strongly supports Logsdon's laboratory error theory.

The ALJ further cited to the fact that Logsdon changed physicians when his doctor declined to increase his pain medication prescriptions despite the recommendation from another physician that he do so, and instead sought treatment from a physician willing to comply with the recommendation.  Tr. 39.  However, because Logsdon's behavior is precisely what would be expected of a patient seeking relief from severe pain, his decision to change physicians simply cannot constitute the requisite legitimate reason for rejecting Dr. Wiggers' opinion.

For the foregoing reasons, I conclude that the Commissioner failed to provide specific, legitimate reasons supported by evidence in the record, for rejecting Dr. Wiggers' opinions to the extent inconsistent with the ALJ's assessment of Logsdon's physical residual functional capacity. Because the Commissioner improperly rejected Dr. Wiggers' opinion that Logsdon needed to lie down for one to two hours at a time, approximately four times per day, and (as will be discussed in greater detail below, the vocational expert who testified at Logsdon's hearing before the ALJ opined that such a limitation would prevent Logsdon from working at any job, the

Page 17 - OPINION AND ORDER

Commissioner's decision shall be reversed and Logsdon's action remanded to the Administration

for award of benefits. *See Harman*, 211 F.3d at 1178, *quoting Smolen v. Chater*, 80 F.3d 1273,

1292 (9th Cir. 1996).

### B.    Logsdon's Testimony

In a Function Report dated October 21, 2005, Logsdon described his typical daily

activities as follows:

> Up at 5:30 a.m., wife sometimes helps me get dressed, take pain pills, eat at 6:30
> a.m.[,] mild walking to try to help extreme pain, take pain pill again at 9:30 a.m.
> (pain pills help but does [*sic*] not make all pain go away) do about ½ hour of
> house work[,] put dishes in dishwasher, wipe down counters, eat lunch at 11:30
> a.m.[,] 1:30 p.m. take pain pills, short walk on my property, afternoon put laundry
> in washer dryer, fold some laundry[,] us[u]ally hot bath in morning & afternoon,
> 5:30 p.m. take pain pills, wife cooks dinner, she does most of the driving for [*sic*]
> I don't want a DUI due to taking pain pills, try to have wife rub legs & feet in
> evening (sore), 9:30 p.m. take pain pills[,] got to bed[.]  I take 1½ Percocet 10-325
> eve[r]y 4 hrs[.]

Tr. 99, 106.   He further indicated that, among the things he was able to do before the onset date

of his disability that he is no longer able to do are "constant driving, lots of walks, s[i]tting,

sleeping, fishing, hunting, trips, working jobs, dressing myself." Tr. 100.  He indicated that he

prepares sandwiches for his own lunches, whereas his wife prepares all other meals, Tr. 101, that

he does four loads of laundry per week, cleans house for four hours per week, and can mow grass

for thirty minutes at a time, Tr. 101, and that he is in constant pain at a level of 7-9 on a 0-10-

point scale even with pain medication, Tr. 104.

At the hearing before the Administrative Law Judge on February 1, 2008, Logsdon

testified that he needed to lie down four or five times per day as an indispensable measure to

alleviate his pain symptoms.  Tr. 467-468.  He further testified that he needed his wife's help to

get dressed in the morning, and that it takes him approximately an hour to two hours to get out of

Page 18 - OPINION AND ORDER

bed, get dressed, and be ready for breakfast.  Tr. 472.

When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms.  20 C.F.R. § 404.1529.  In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*).

In weighing a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily activities, h[is] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains."  *Id.* (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997).  While a finding that a claimant lacks credibility cannot be premised solely on a lack of medical support for the severity of his pain, *see Light*, 119 F.3d at 792, *citing Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), where the ALJ's credibility finding is supported by substantial evidence in the record, the finding will not be disturbed, *Thomas*, 278 F.3d at 959, *citing Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

Here, as discussed above, the ALJ listed a number of reasons for doubting the credibility of Logsdon's reported pain levels, including Logsdon's claims that his L5-S1 fusion was broken, Tr. 37, the apparently arbitrary selection of a disability onset date, Tr. 38, physicians' chart notes

describing Logsdon as "in no acute distress" and able to move about satisfactorily, Tr. 38, the

opinion of Dr. Sorweide that Logsdon's level of functioning was higher than he let on and that

Logsdon exhibited a "level of dishonesty, Tr. 38, Logsdon's extensive pain medication history,

including instances of lost prescriptions, stolen or flushed medications, and requests for early

refills, Tr. 39, Logsdon's negative drug screen for OxyContin, Tr. 39, and the fact that Logsdon

changed physicians when his previous doctor declined to increase his pain medications on

request, Tr. 39.  For the same reasons that none of these purported inconsistencies provides a

justification for rejecting Dr. Wiggers' opinion, the proffered reasons are insufficient to permit

the conclusion that the ALJ did not arbitrarily reject Logsdon's testimony.  *See supra*.

### C.    Cindy's Testimony

In a third-party Function Report dated October 30, 2005, Logsdon's wife, Cindy, reported

that even on good days it takes Logsdon a couple of hours to get dressed in the morning, with her

assistance, and that on bad days he cannot even leave the house.  Tr. 122, 123.  She indicated that

it can take Logsdon all day to use a washing machine to clean a couple of loads of laundry due to

the severity of his pain symptoms.  Tr. 124.  She reported that he was only able to sit or stand for

15-30 minutes at a time.  Tr. 127.

On February 15, 2007, Cindy wrote a letter stating that Logsdon needed to lie down for at

least 30 minutes at a time every couple of hours, and that he was unable to lift more than 5

pounds "on occasion."  Tr. 152.

At the February 1, 2008, hearing, the Administrative Law Judge heard Cindy testify as to

Logsdon's impairments and limitations.  Tr. 475-480.  Specifically, she testified that Logsdon

suffered "multiple migraines on a daily basis, anywhere from one but mostly two, three,

sometimes up to six or more migraine's in a day's time," ranging in intensity from "very mild to incapacitating."  Tr. 475.  She reported that he had perhaps two or three days out of seven on which he felt able to do a little bit of housework, and that on remaining days he was incapable of that much exertion.  Tr. 476-477.  She testified that she helped Logsdon get dressed most mornings, Tr. 478, and that she did not believe he was able, even on his best days, "to go do anything on a scheduled basis, Tr. 479.

On each of the two days following the hearing, Cindy wrote a letter "clarifying" her hearing testimony as follows:

> Tim and I have been together for 32 years.  In that time I have never seen him swim.  I know for a fact that he does not know how to swim.  What he does is sit in a three foot deep by 12 foot round wading pool.  We have a soft sided above ground pool in our back yard that our grand kids play in during the summer to cool off in when they visit.  Tim sits in it with a blow up float ring around his chest.  This allows him to semi float and takes the pressure off his back, allowing him to relax a bit.

Tr. 180.

> Tim has lost a great deal of his inabilities [*sic*] to do the activities that he once enjoyed.  In the years that we have been together I have always known him to be a very active person.  Yet for the last couple of years the simple ability to sit at the kitchen table and play a card game or a game of chess, which in the past we have often enjoyed, has been unbearable.  Also because of his inability to sit in one position for any length of time, traveling has become almost impossible.  He is unable to go fishing on the river because he cannot stand in one place for any length of time without having his legs go out on him.  He has not been able to go deer hunting the last couple years because he can not get out and walk.  Tim has been an avid hunter and fisherman since he was a kid.  We are no longer able to go hiking which is something we had done since we have been together.  And . . . due to his constant back pain, it has dramatically affected our ability to have an intimate relationship.

Tr. 179.

Logsdon argues that the ALJ improperly rejected Cindy's testimony in assessing his

Page 21 - OPINION AND ORDER

residual functional capacity. "An ALJ need only give germane reasons for discrediting the testimony of lay witnesses." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005), *citing Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Inconsistency with medical evidence is considered a "germane" reason for discrediting lay witness testimony. *See id.*, *citing Lewis*, 236 F.3d at 511.

Here, to the extent the ALJ discredited portions of Cindy's testimony, he provided germane reasons for so doing that are supported by substantial evidence in the record. He discussed and relied upon medical evidence arguably inconsistent with Cindy's testimony, including the medical opinion of Dr. Sorweide, discussed in greater detail above. Because germane reasons are sufficient for discrediting lay witness testimony, without more, the court shall not disturb the ALJ's tacit finding that portions of Cindy's testimony were not credible.

## II.    Step Five:  Hypothetical Posed to Vocational Expert

At the hearing before the Administrative Law Judge on February 1, 2008, the ALJ asked a vocational expert ("VE") a series of hypothetical questions regarding work opportunities available to a 48-year-old job candidate with a GED and no other vocational education, and with physical restrictions like those applicable to Logsdon. Tr. 481-483. First, the ALJ asked the VE about such a candidate limited to:

> light work with 20 pounds occasionally lifted, 10 pounds frequently. Pushing and pull would be limited by the weights. Standing . . . and walking would be . . . about six hours in an eight-hour workday. Sitting would be about six hours in an eight-hour workday. All of the postural limitations are limited to occasional. That's the bending, climbing, crouching, crawling and so on. . . . Let's assume that a person can perform this on a sustained basis in a competitive setting.

Tr. 481-482. In response, the VE indicated that such a person would be able to perform Logsdon's past relevant work in RV sales, but not in landscaping. Tr. 482. She further indicated

Page 22 - OPINION AND ORDER

that such a person would be able to perform the duties of positions such as outside deliverer

(light, unskilled labor, SVP 2, 100,000 jobs in the national economy and 1,000 in the regional

economy), Tr. 482, information clerk (light, unskilled labor, SVP 2, 50,000 jobs in the national

economy and 850 in the regional economy), Tr. 482, and office helper (light, unskilled labor,

SVP 2, 100,000 jobs in the national economy and 1,300 in the regional economy), Tr. 483.

Second, the ALJ added to the foregoing physical restrictions the restriction that the person

is required to lie down "four to five times a day, anywhere . . . from 2 hours up to 10 hours" total.

Tr. 483.  With that additional restriction, the VE indicated that the person would be precluded

from working.  Tr. 483.

Despite the VE's response to the second hypothetical, the ALJ relied on the responses to

the first hypothetical to conclude that Logsdon was able to perform past relevant work and other

work existing in significant numbers in the national economy.  Tr. 41.

"An ALJ must propound a hypothetical to a [vocational expert] that is based on medical

assumptions supported by substantial evidence in the record that reflects all the claimant's

limitations."  *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001), *citing Roberts v. Shalala*,

66 F.3d 179, 184 (9th Cir. 1995).  "The hypothetical should be 'accurate, detailed, and supported

by the medical record.'"  *Id.*, *quoting Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).  "It

is, however, proper for an ALJ to limit a hypothetical to those impairments that are supported by

substantial evidence in the record."  *Id.*, *citing Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th

Cir. 1989).

The ALJ's decision to exclude any limitations requiring Logsdon to lie down several

times per day, for one to two hours at a time, is not supported by substantial evidence in the

record.  As noted above, the ALJ erred in rejecting Dr. Wiggers' medical opinion that Logsdon was required to lie down four times daily for one to two hours at a time, an opinion supported by medical evidence in the record, including Logsdon's credible reports of the severity of his symptoms, which the ALJ also erred in rejecting.  Indeed, nothing in Logsdon's medical records notes casts doubt on Logsdon's self-reports both to his physicians and to the Administration of needing to lie down several times per day for extended periods of time.

Because the ALJ's decision to exclude limitations requiring Logsdon to lie down several times per day for extended periods of time is not supported by substantial evidence, the Commissioner erred both in finding that Logsdon could perform relevant past work and in concluding that Logsdon was not precluded from working by reason of his physical limitations. Because when those limitations were included in the hypothetical the VE opined that a candidate with Logsdon's limitations would be wholly precluded from working, the Commissioner further erred in failing to award Logsdon disability insurance benefits.  The ALJ's failure to include these limitations, in light of the VE's unambiguous opinion that such limitations would preclude all

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Page 24 - OPINION AND ORDER

work, mandates remand for immediate award of benefits. *See Harman*, 211 F.3d at 1178,

*quoting Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision is reversed, and this

case is remanded to the Administration for award of benefits. A final judgment will be prepared.

Dated this 5th day of November, 2009.


 /s/  Paul Papak
Honorable Paul Papak
United States Magistrate Judge

**APPENDIX I**

Logsdon consulted with physicians for left lower back pain on three occasions in 1994.

Tr. 407-410, 406, 427-429.  In December 1994, Logsdon's treating physician Ronald L.

Henderson, M.D., assessed Logsdon with "probable nonunion of L5-S1 fusion," and

recommended MRI and CT imaging studies.  Tr. 427-429.  On March 15, 1995, an MRI of

Logsdon's lumbar spine found no evidence of nonunion at the L5-S1 level, and found only mild

and stable irregularity of the pars at the L5 level:

> Sagittal views of the lumbar spine demonstrate the vertebral bodies to maintain a
> normal size and shape.  Normal alignment is also appreciated, with no evidence
> for spondylolisthesis.  Intervertebral disc spaces appear maintained and without
> significant change from [April 29, 1992].  Again noted are changes of desiccation
> involving the L5-S1 intervertebral disc.
>
> Axial views were obtained from L3 through S1.  . . .  The patient is status post
> fusion of the L5-S1 level.  Increased soft tissue signal is seen along the lateral
> aspect of the posterior elements at the L5-S1 level; following gadolinium
> administration this shows diffuse but irregular enhancement.  No compromise of
> the neural foramen or thecal sac is noted.  No abnormal alignment is noted either
> on the sagittal or axial views, although fine areas of nonunion may not be
> appreciable due to the spatial resolution of MRI, and this area may be better
> evaluated using CT if indicated.  There is no evidence for disc herniation at this
> level.  Descending S1 nerve rootlets appear intact.
>
> The L3-4 and L4-5 levels show no evidence of focal abnormality.  No foraminal
> or canal stenosis is noted.  Their [*sic*] remains irregularity involving the pars
> bilaterally at the L5 level; again this is not changed appreciably since [April 29,
> 1992] and bilateral pars defects are a consideration in this region.

Tr. 423-424.  Two days later, on March 17, 1995, a CT scan revealed inadequate fusion[4]

---

[4]  This finding is by contrast to the chart note of May 27, 2000, in which Logsdon's
prescribing physician Maria D. Miller, M.D., reported reviewing a CT scan of March 30, 1995,
that "showed no evidence of bony fusion at L5-S1."  Tr. 234.  The medical record contains no
evidence of a CT scan of March 30, 1995, or of any CT scan showing no evidence of bony fusion
at the L5-S1 level.

bilaterally at the L-5 level:

> L2-3, 3-4, and 4-5 disk spaces show no disk herniation, spinal stenosis nor foraminal stenosis.  A broad-based bulging disk is seen of small size at the lumbosacral level.  There is no focal disk herniation nor spinal stenosis.  Neural foramina appear without significant encroachment.
>
> Bilateral spondylolysis is present at the lumbosacral level.  This is apparent on both axial and reformatted parasagittal planes.  There is no measurable spondylolisthesis at this time, however.  A laminectomy at this level is present. The fusions are inadequate bilaterally, fusing the transverse processes of L-5 to the sacrum.

Tr.  422.  Logsdon met with Dr. Henderson in May and again in July of 1995 to discuss a repeat of Logsdon's 1993 back surgery.  Tr. 421, 419.  On two occasions in July and on one occasion in August 1995, Dr. Henderson wrote letters to Logsdon's workers' compensation insurer to discuss Logsdon's eligibility for repeat surgery.  Tr. 420, 418, 417.  In September 1995, Logsdon reported to Dr. Henderson that he was experiencing increased back pain.  Tr. 413-415.  In October 1995, Dr. Henderson advised Logsdon that he should make a decision regarding the proposed repeat lumbar fusion surgery "within the next two weeks," and that in the event he elected against the surgery, the workers' compensation claim would be closed.  Tr. 412.  That was Logsdon's last consultation with Dr. Henderson.

In July 1996, Logsdon began consulting with a chiropractor, Glen A. Litwiller, D.C., to treat "discomfort through the upper and midthoracic section of the spine."  Tr. 216.  According to Dr. Litwiller's notes, the discomfort had "been with" Logsdon "for a while" but had become more acute over the previous weekend.  Tr. 216.  Logsdon received chiropractic "adjustments" from Dr. Litwiller to treat back pain, neck pain, and migraine headaches twice in July 1996.  Tr. 216.

Following July 1996, Logsdon's medical records indicate that he did not consult with any health care provider for any reason until he returned to Dr. Litwiller in November 1999,

Page 27 - OPINION AND ORDER

complaining of acute upper back and neck pain on the left side.  Tr. 215-216.  Logsdon received

chiropractic adjustments from Dr. Litwiller in November 1999 and January 2000 in connection

with his reported pain symptoms.  Tr. 215, 215-216.

In June 2000, Logsdon was prescribed Vicodin for chronic back pain by Maria D. Miller,

M.D.  Tr. 233.  Dr. Miller noted that Logsdon was at that time already using "periodic Vicodin"

to control his pain symptoms, Tr. 233, but the medical record contains no information as to how

he obtained the medication before seeing Dr. Miller.

In August 2001, Logsdon began consulting with Jim Shames, M.D., for fatigue and

chronic pain.  Tr. 232.  In September 2001, Dr. Shames assessed Logsdon as suffering from

chronic pain syndrome, fatigue of unclear etiology, and dyspepsia.  Tr. 231.

In April 2002, Logsdon was seen once again by his chiropractor, Dr. Litwiller.  Tr. 215.

Logsdon received three chiropractic adjustments from Dr. Litwiller in April 2002.  Tr. 215, 214.

In May 2002, Logsdon consulted again with Dr. Shames, who prescribed Percocet to treat

Logsdon's back pain symptoms.  Tr. 230.  In July 2002, Logsdon returned to Dr. Shames,

reporting that one week earlier he had strained his thoracic spine when he was involved in a

motor vehicle accident in which he was required to jump out of the way of his truck to avoid it

rolling over on him.[5]  Tr. 228.  Dr. Shames gave Logsdon a new prescription for Percocet in

connection with the injury.  Tr. 228.

In September 2002, Logsdon consulted for the first time with Scott Swindells, P.A., a

physician's assistant in Dr. Shames' offices.  Tr. 229.  In the course of that consultation, Logsdon

---

[5]  The parallels with the 1984 incident, in which Logsdon's back was first injured when he
jumped to avoid a rolling log, are striking.

reported that his "recurrent" back pain had gotten worse in the previous week, and of migraine

headaches.  Tr. 229.  Logsdon reported at that time that he was using the Percocet prescribed for

him by Dr. Shames in connection with his migraine headaches, and that he had only used

approximately six pills in the previous month.  Tr. 229.  Swindells arranged for Logsdon to

receive a new prescription for Percocet.  Tr. 229.  Swindells refilled Logsdon's pain medications

in December 2002 and January 2003, Tr. 227, 226, increased his pain medication prescription in

February 2003, Tr. 225, and refilled them again in March 2003, Tr. 224.  At the January 2003

appointment, Swindells prescribed propranolol for Logsdon's migraine headaches.  Tr. 226.

On April 11, 2003, Logsdon began consulting with a new chiropractor, David D.

Albrecht, D.C., complaining of lower back and upper leg pain.  Tr. 213.  Dr. Albrecht ordered an

X-ray of Logsdon's spine, which indicated successful fusion at the posterior L5-S1 level:

> The patient has had fusion of L5-S1 posteriorly with decompression laminotomy.
> Marked fusion bone is seen in the posterior elements.  The stature of the vertebral
> bodies are [sic] maintained.  The pedicles are intact.  Disc heights are well
> preserved with the exception of moderate narrowing of L5-S1.

Tr. 235.  On April 14, 2003, Dr. Albrecht opined that Logsdon's symptoms of significant lower

back pain were indicative of muscle spasms, and instructed him in hip rotator-stretching

techniques.  Tr. 211.  On April 17, 2003, Dr. Albrecht prescribed physical therapy and massage.

Tr. 211.  On April 21, 2003, following an examination by Dr. Albrecht, Logsdon reported

significant improvement of his pain symptoms.  Tr. 210.  Dr. Albrecht recommended that

Logsdon continue his stretching exercises.  Tr. 210.

On April 24, 2003, a new X-ray study, consistent with the study of April 11, 2003,

indicated successful posterior fusion at the L5-S1 level:

> Prior posterior fusion at L5-S1 is seen, along with L5 laminectomy.  Disk height

Page 29 - OPINION AND ORDER

is preserved, except for moderate narrowing at L5-S1.  Facet joints appear
maintained.

Tr. 217.

On April 28, 2003, Dr. Albrecht assessed Logsdon with "failed low back syndrome."  Tr.

210.  Dr. Albrecht continued Logsdon's treatment with physical therapy and massage on that

date, and on three further occasions in the first half of May 2003.  Tr. 210, 209.

In June 2003, Logsdon saw Swindells for a refill of his Percocet.  Tr. 223.  Later that

month, Logsdon reported to his chiropractor, Dr. Albrecht, that his pain symptoms had settled

down to "a 4 or 5, which is normal for pre-October 2002 level of discomfort."  Tr. 208.  Dr.

Albrecht assessed Logsdon with failed back syndrome and chronic lower back pain, and provided

further instruction in back-stretching techniques.  Tr. 208.

Logsdon continued seeing Swindells for refills of his pain medication, including

medications for migraine headache pain, consulting with him for that purpose in August,

September, and October 2003, and in January 2004.  Tr. 222, 221, 220, 219.

In January 2004, Logsdon reported to Dr. Albrecht that he was suffering increased levels

of pain, and that his pain was impairing his ability to sleep.  Tr. 207.  In February 2004, Dr.

Albrecht wrote to Logsdon's workers' compensation insurer, stating that "[a]t no time has Tim

been pain free since the accident, including through his surgery and subsequent failed outcome."

Tr. 205, 206.  Dr. Albrecht indicated his "concern . . . that even though Tim has had a history of

constant pain with episodes of severe pain, he has an increased level of pain over the past nine

months that has been constant.  His present symptomatology is consistent with all of his past

complaints of lower back pain."  Tr. 205, 206.  Dr. Albrecht opined that Logsdon's "need for

treatment for his back complaints is a result of injuries sustained on 09-28-84 which never did

Page 30 - OPINION AND ORDER

completely resolve and led to surgery and subsequent failed back surgery.  There are no intervening injuries that preclude that incident.[6]  The worsening of his complaints is the normal course of failed back syndrome."  Tr. 205, 206.  Dr. Albrecht concluded that Logsdon "should be seen through a pain clinic and managed by a neurologist, psychiatrist, or neurosurgeon."  Tr. 205, 206.

Later in February 2004, Logsdon consulted with Kristin K. Miller, M.D., for pain management.  Tr. 218.  Dr. Miller noted that, as of the time of her consultation with him, Logsdon was going through 120 Percocet tablets per month.  Tr. 218.  Logsdon reported to Dr. Miller that he had cut down on his landscaping contracts, which had improved his pain symptoms.  Tr. 218.

On August 5, 2004, in the course of a visit to Swindells for refill of pain medications, Logsdon reported that his pain was under reasonable control, apparently because he was "sitting a lot" in connection with his RV sales job.  Tr. 373.  Nevertheless, Logsdon was later to claim August 28, 2004, as the onset date for his disability.  Moreover, the following month, September 2004, Logsdon called Swindells to advise that his pain medications were not lasting through the full period for which they had been prescribed.  Tr. 372, 371.  In October 2004, Logsdon received chiropractic adjustments from Dr. Litwiller for increased upper back and upper leg pain.  Tr. 204, 203.  In November 2004, Logsdon received new pain medications from Swindells for both back pain and chronic migraine headaches, Tr. 369, 370, and a further chiropractic adjustment from Dr. Litwiller, Tr. 203.

---

[6]  Dr. Albrecht was apparently unaware of the July 2002 motor vehicle accident Logsdon reported to Dr. Shames.  *See supra*.

In December 2004, Logsdon consulted for the first time with Earl Peterson, M.D., complaining of "persistent lower back pain with intermittent popping and radiation of discomfort into both lower extremities." Tr. 239-240. Dr. Peterson interpreted an X-ray study of Logsdon's lumbar spine – apparently the study of April 24, 2003 – as indicating "narrowed L5-S1 disc interval with evidence of spondylolysis at L5, with the anteroposterior view demonstrating a fusion mass with uncertain status regarding possible bridging of the interval." Tr. 242. Dr. Peterson determined that Logsdon was able to "move[] about satisfactorily. He [wa]s able to heel and toe rise." Tr. 239-240. Dr. Peterson assessed Logsdon with "[p]robable nonunion, lumbosacral fusion, with spondylosis at L5 and ongoing significant symptoms related to degenerative disc disease and probable S1 nerve root irritation," and referred him for a new lumbar spine MRI. Tr. 239-240.

Later in December 2004, Logsdon met for the first time with Timothy E. Roberts, M.D., who prescribed OxyContin for his low back pain. Tr. 367.

In January 2005, an MRI of Logsdon's lumbar spine revealed stable posterior fusion at the L5-S1 level:

> The normal lumbar lordosis and lumbar vertebral body height, alignment and intervertebral disc spaces appear to be maintained [as compared to the MRI study of March 14, 1995]. The mild to moderate loss of L5-S1 intervertebral disk space with intervertebral disk desiccation is again noted. The conus medullaris extends to the T12-L1 level and no abnormality of the visualized spinal cord or nerve roots is identified. The thecal sac terminates normally at the inferior S2 level. No bone marrow signal abnormality is seen. the T12-L1, L1-2, and L2-3 vertebral levels have no significant intervertebral disk bulge, neural foraminal or vertebral canal stenosis. no nerve root impingement is seen. Minimal facet arthrosis is noted at the T12-L1 and L1-2 and mild to moderate at the L2-3 vertebral level.
>
> The L3-4 vertebral level has no significant intervertebral disk bulge, neural foraminal or vertebral canal stenosis. No nerve root impingement is seen. Mild facet arthrosis is noted.

The L4-5 vertebral level also has no significant intervertebral disk bulge, neural foraminal or vertebral canal stenosis.  Mild facet arthrosis is seen.

The L5-S1 vertebral level has minimal posterior intervertebral disk bulge with no significant effacement of the thecal sac.  The post-osseous fusion and post-laminectomy changes appear overall stable.  The neural foramen are widely patent with no impingement of the exiting bilateral L5 nerve roots.

Tr. 241, 380-381.

On January 5, 2005, Logsdon called Dr. Roberts' offices to advise that he would run out of OxyContin early, and to set up an early appointment to refill his prescription.  Tr. 366.

On January 10, 2005, Logsdon consulted with Dr. Litwiller in connection with his lower back pain.  Tr. 202.  Dr. Litwiller opined that Logdon's recent MRI suggested "facet arthritic change and degenerative disease in the disk rather than stenosis."  Tr. 202.  Dr. Litwiller assessed Logsdon as suffering from recurring costovertebral joint dysfunction, and performed a chiropractic adjustment.  Tr. 202.

On January 13, 2005, Logsdon saw Dr. Roberts for chronic pain management and to obtain a refill of his OxyContin prescription.  Tr. 364-365.  On that same day, Logsdon consulted with Dr. Peterson to follow up on his back pain treatment.  Tr. 237.  Dr. Peterson opined that the recent MRI indicated a "[s]table condition, L5-S1 laminectomy, with posterolateral fusion, without evidence of nerve root functional compromise currently."  Tr. 237.

The following week, on January 21, 2005, Logsdon returned to Dr. Roberts' offices for a pain medication refill, explaining that he would be unable to visit the clinic at his next scheduled appointment.  Tr. 363.  A little over two weeks later, on February 9, 2005, Logsdon called Dr. Roberts' offices to advise that he had accidentally thrown away one of his Percocet prescriptions unfilled, and to request a replacement.  Tr. 362.  Less than two weeks later, on February 21,

Page 33 - OPINION AND ORDER

2009, Logsdon called Dr. Roberts' offices to advise that he had "flushed" his 20 mg OxyContin tablets, and to request a new prescription for 10 mg tablets instead.  Tr. 359.  On March 3, 2005, Dr. Roberts wrote Logsdon prescriptions for OxyContin and Percocet, as requested, Tr. 360-361, and refilled both prescriptions on March 31, 2005, Tr. 357-358.  On April 5, 2005, Logsdon called again, to indicate that he would soon run out of Percocet, and on April 6, 2005, Dr. Roberts refilled his prescription again.  Tr. 355-356.

Logsdon called Dr. Roberts' offices again on April 21, 2005, complaining that his pain medication was ineffective.  Tr. 354.  Indicating that the brand of Percocet that Logsdon was using was commonly found ineffective, Dr. Roberts agreed to write a new prescription on the condition that someone serve as a witness when Logsdon flushed his "old" medications.  Tr. 354. On April 22, 2005, Logsdon brought his old medications to Dr. Roberts' offices for proper disposal, and obtained a new prescription.  Tr. 353.

On May 9, 2005, Logsdon called Dr. Roberts' offices to request an early refill of his pain medication prescription.  Tr. 352.  On May 31, 2005, Logsdon reported his pain medications stolen from his truck, and again requested an early refill.  Tr. 351, 348-350.  His pain medications were refilled again at a regularly scheduled chronic pain management visit on June 30, 2005.  Tr. 345-347.

Logsdon consulted again with Dr. Litwiller on August 1, 2005, complaining of upper back and neck pain.  Tr. 202.  Dr. Litwiller assessed Logsdon with acute cervical strain, and performed a chiropractic adjustment.  Tr. 202.

Logsdon refilled his pain medication prescriptions at a chronic pain management visit to Dr. Roberts' offices on August 25, 2005.  Tr. 342-343.

Page 34 - OPINION AND ORDER

On August 29, 2005, Logsdon reported to Dr. Litwiller that he was experiencing migraine headaches. Tr. 201. Dr. Litwiller assessed Logsdon with cervical cranial syndrome and costovertebral joint dysfunction, and performed a chiropractic adjustment. Tr. 201.

On September 15, 2005, Logsdon called the offices of Dr. Roberts indicating that he had flushed his Percocet, due to fears of addiction, and wanted to try methadone instead. Tr. 340-341. Logsdon was told to return to the clinic on September 22, 2005. Tr. 340-341. Logsdon returned at the scheduled time, and received a methadone prescription for one week's worth of pills. Tr. 337-339. Logsdon returned on September 29, 2005, and received a second week's worth of pills. Tr. 335-336. On October 6, 2005, Logsdon indicated that he did not think methadone was appropriate for him, due to side affects of nausea. Tr. 334. On October 10, 2005, Logsdon returned to Percocet for management of his pain symptoms. Tr. 333.

On October 21, 2005, Logsdon filled out a Function Report in connection with his September 7, 2005, application for DIB. Tr. 99-106. In his Function Report, Logsdon described his daily activities as follows:

> Up at 5:30 a.m., wife sometimes helps me get dressed, take pain pills, eat at 6:30 a.m.[,] mild walking to try to help extreme pain, take pain pill again at 9:30 a.m. (pain pills help but does [*sic*] not make all pain go away) do about ½ hour of house work[,] put dishes in dishwasher, wipe down counters, eat lunch at 11:30 a.m.[,] 1:30 p.m. take pain pills, short walk on my property, afternoon put laundry in washer dryer, fold some laundry[,] us[u]ally hot bath in morning & afternoon, 5:30 p.m. take pain pills, wife cooks dinner, she does most of the driving for [*sic*] I don't want a DUI due to taking pain pills, try to have wife rub legs & feet in evening (sore), 9:30 p.m. take pain pills[,] got to bed[.]  I take 1½ Percocet 10-325 eve[r]y 4 hrs[.]

Tr. 99, 106. He further indicated that, among the things he was able to do before the onset date of his disability that he was no longer able to do are "constant driving, lots of walks, s[i]tting, sleeping, fishing, hunting, trips, working jobs, dressing myself." Tr. 100. He indicated that he

Page 35 - OPINION AND ORDER

prepared sandwiches for his own lunches, whereas his wife prepared all other meals, Tr. 101, that

he did four loads of laundry per week, cleaned house for four hours per week, and could mow

grass for thirty minutes at a time, Tr. 101, and that he was in constant pain at a level of 7-9 on a

0-10-point scale even with pain medication, Tr. 104.  In a Claimant Pain Questionnaire filled out

October 24, 2005, Logsdon reported pain symptoms he characterized as "Back burning - numb -

pins needles - hot spots - stinging - cramps - shooting - stabbing" and "legs-feet shooting - numb

- aching - pins needles - cramping" taking place "all the time 24-7."  Tr. 111.

On October 25, 2005, Logsdon again called Dr. Roberts' offices to advise that he would

run out of Percocet before his next scheduled refill appointment.  Tr. 332.  Two days later, on

October 27, 2005, Logsdon received a prescription refill.  Tr. 330-331.

In a third-party Function Report filled out October 30, 2005, Logsdon's wife Cindy A.

Logsdon ("Cindy") described Logsdon's daily activities as follows:

> When he gets up, it takes him a couple hours to get moving due to pain &
> stiffness.  Some days he can motivate to get outside and do a little yard work, he
> does some of the laundry.  Most days he sits in his recliner or walks around the
> yard.

Tr. 122.  Cindy also stated as follows in her Function Report:

> I have watched [Logsdon] struggle with this back injury for 21 years.  He has tried
> to maintain a normal life style to the best of his ability.  He has tried to work and
> has not been able to maintain a job due to the inability to stand, walk, or sit for
> any length of time.  In the last three years I have watched him give up activities
> that he has enjoyed all his life, such as camping, hunting, fishing, and hiking.  I
> watch him struggle every morning just to get out of bed and start his day.  He
> struggles with depression and anger because he can't earn a living to support his
> family.  Though he has been actively looking for work he has become discouraged
> because employers can see he has a back problem with the [way] he moves.  He
> walks with a guarded, stiff gait.  He can't pass a drug test due to the pain
> medication.  He has gone through State of Oregon Voc. Rehab. twice with no
> success not to mention when he went through Workers' Comp. Voc. Rehab.

Page 36 - OPINION AND ORDER

Tr. 129.

Logsdon's pain medication prescriptions were refilled at a regularly scheduled chronic

pain management visit on November 17, 2005.  Tr. 327-329.

On December 7, 2005, Logsdon was seen for a "disability physical" by orthopedist

Derrick J. Sorweide, D.O.  Tr. 243-244.  Dr. Sorweide concluded that:

> [Logsdon] has had back surgery with a good result.  His shoulder is a non-issue.
> His level of functioning is higher than he lets on.  He had several inconsistent
> findings showing me a level of dishonesty.
>
> Based on findings today, he can work 8 hr days/40 hr weeks.  He can sit, stand
> and walk without limit - but should be allowed frequent position changes.  . . .
> Lifting and carrying should be limited to 30 lbs rarely, and 20 lbs frequently.

Tr. 243-244.

Logsdon returned to Dr. Roberts' offices on December 8, 2005, for a chronic pain

management visit, one week earlier than scheduled.  Tr. 327-329.  Because Logsdon had used up

all his pain medications a full week earlier than planned, physician's assistant Joe Patton, P.A.,

ordered that Logsdon undergo a drug screen.  Tr. 324.  The drug screen came back negative for

OxyCodone, Tr. 379, a red flag for Patton since Logsdon claimed to be taking his pain

medications.  However, Logsdon asserted that the negative screen must have been lab error, and

a subsequent screen on December 15, 2005, was positive for OxyCodone.  Tr. 376-378.

Logsdon's pain medications were therefore refilled that same day.  Tr. 321-323.

On December 19, 2005, Logsdon underwent a consultative disability examination

performed by Sharon B. Eder, M.D.  Tr. 247-254.  On the basis of her consultation and her

review of Logsdon's medical records, Dr. Eder concluded that Logsdon could occasionally lift 20

pounds and frequently lift 10 pounds, could stand or walk 6 hours during an 8 hour workday, and

could sit 6 hours during an 8 hour workday, specifically stating that he was able "to

sit/stand/walk for 6/8 hours with normal breaks and allowed frequent position changes."  Tr. 248.

Dr. Eder found that Logsdon had no limitations in his ability to push or pull.  Tr. 248.  She found

occasional limitations in postural functions such as climbing, balancing, stooping, kneeling,

crouching, and crawling.  Tr. 249.  She found no manipulative, visual, communicative, or

environmental limitations.  Tr, 250-251.  She expressly opined that "Cl[aimant]'s stated

limitations are not credible, he did not present at exam with the significant limitations he

describes in ADL's.  It is also noted that in 8/05 cl[aimant] was swimming."  Tr. 254.

From December 2005 through February 2006, Logsdon continued to be seen at regular

intervals in Dr. Roberts' offices for chronic pain management and pain medication prescription

refills.  Tr. 318-320, 317, 315-316, 314, 312-313, 311, 310, 307-308, 303-306.  On February 22,

2006, Logsdon requested reconsideration of the Administration's adverse disability

determination.  Tr. 57-58.  Logsdon continued to be seen for chronic pain management and for

prescription refills in Dr. Roberts' offices from February 2006 through March 2006.  Tr. 302,

301, 300, 298, 297, 295-296, 294.

On April 5, 2006, Logsdon consulted for the first time with Linford S. Beachy, M.D.  Tr.

292-293.  Dr. Beachy assessed Logsdon with chronic low back pain and migraine headaches.  Tr.

292-293.  Dr. Beachy also refilled Logsdon's pain medication prescriptions on May 5, 2006.  Tr.

290.

In June 2006, Logsdon returned to Dr. Beachy for a refill of his pain medication.  Tr. 288-

289.  Later that month, on June 16, 2006, an MRI of Logsdon's lumbar spine revealed a

laminectomy defect at the L5-S1 level:

Page 38 - OPINION AND ORDER

The lumbar vertebral alignment shows minimal thoracolumbar levoscoliosis. The dorsal alignment is maintained. The disk spaces show slight narrowing at L5-S1. The vertebral body stature is preserved. The marrow signal intensity appears normal. The lumbar spinal canal is capacious, and no findings of lumbar central stenosis or compromise are seen. Laminectomy defect is evident at the L5-S1 level. Mild right posterolateral disk protrusion and vertebral spurring at L5-S1 produce mild abutting without compressing the exiting right L5 nerve root. The facet joints are relatively maintained.

Tr. 411, 374-375.

On June 26, 2006, a drug screen of Logsdon's urine tested negative for all drugs screened for. Tr. 285-286. Dr. Beachy refilled Logsdon's pain medications on that same date. Tr. 284.

In August 2006, Logsdon requested early refill of his pain medication prescription, reporting that the pharmacy had given him only 2/3 of his prescription on his last visit. Tr. 282. Dr. Beachy refilled Logsdon's pain medication prescriptions in August, September, October, November, and December 2006. Tr. 282, 281, 280, 279, 277.

On December 23, 2006, Logsdon wrote a "journal" of one of his typical days. Tr. 146-150. In his journal, he described a day dedicated almost exclusively to pain management behaviors, with little time left over to accomplish a small handful of domestic chores. Tr. 146-150. Logsdon indicated that he suffered approximately three migraine headaches per day, ranging in duration from one to two-and-a-half hours. Tr. 150.

In January 2007, Logsdon consulted for the first time with Shawn M. Sills, M.D., complaining of low back pain. Tr. 268-269. Dr. Sills assessed Logsdon with failed back surgical syndrome, and on January 4, 2006, administered a caudal epidural injection. Tr. 268-269, 266-267. On January 5, 2007, Dr. Beachy gave Logsdon an early refill of his pain medication prescription, but indicated that he would not provide any further early refills. Tr. 275. Dr. Sills administered additional caudal epidural injections on January 11 and 18, 2007. Tr. 264-265,

Page 39 - OPINION AND ORDER

262-263.  On January 29, 2007, Logsdon called Dr. Beachy to report that the epidural injections

administered by Dr. Sills only served to increase his experience of pain symptoms, that Dr. Sills

had opined that Logsdon's L5-S1 fusion "has broke apart and doesn't understand why nobody else

can see this," and to request additional Percocet.  Tr. 274.  Dr. Beachy refilled Logsdon's pain

medication prescriptions in January and February 2007.  Tr. 273-274.

On February 14, 2007, Logsdon consulted with Dr. Sills for a follow-up appointment in

connection with his lower back pain.  Tr. 260-261.  Although Logsdon reported "resolution" of

his "shooting pain, radiating into the legs," he indicated that he believed he did not get effective

relief from the caudal epidural series he had received, and was interested in discussing alternative

treatment options.  Tr. 260.  Dr. Sills referred Logsdon to Dr. O'Sullivan to determine whether

further surgery might be an option.  Tr. 261.

On February 15, 2007, Logsdon's wife Cindy wrote a letter addressed to Logsdon's

counsel, stating as follows:

> I am writing to make sure the record is clear on my husband Tim's back condition.
> He has deteriorated in the last two years and finds it necessary on a daily basis to
> lay down every couple hours for at least 30 minutes at a time to get the weight off
> his legs and back.  He has also become unable to life more than 5 lbs. on occasion.

Tr. 152.

Logsdon consulted for the first time with Marcel Wiggers, M.D., on March 6, 2007.  Tr.

396-397.  Logsdon reported symptoms of severe back pain, effectively present since 1984, and

daily migraine headaches lasting from 15 minutes to 2 hours.  Tr. 396.  Dr. Wiggers assessed

Logsdon with chronic back pain, migraine headaches, and other issues.  Tr. 397.  Dr. Wiggers

increased Logsdon's morphine prescription, prescribed migraine medications, and left his

Percocet prescription unchanged.  Tr. 397.  Logsdon was seen by Dr. Wiggers for a follow-up

Page 40 - OPINION AND ORDER

appointment on March 20, 2007, on which occasion Logsdon signed a "pain contract."  Tr. 393-395.

Dr. Wiggers saw Logsdon again for chronic pain and to refill his pain medication prescriptions, including prescriptions for both back pain and migraine headache pain, in April and May 2007.  Tr. 393, 392.  On June 1, 2007, Dr. Wiggers refilled Logsdon's prescriptions again, this time increasing the morphine prescription.  Tr. 391.  On June 29, 2007, Dr. Wiggers refilled Logsdon's pain medications again.  Tr. 390.

On July 23, 2007, Logsdon's counsel wrote to Dr. Wiggers, requesting that Dr. Wiggers confirm or modify counsel's summary of Wiggers' assessment of Logsdon's condition.  Tr. 383-384.  Dr. Wiggers signed off on the summary, agreeing that:

> '[F]ailed back surgical syndrome' . . . [is] a reasonable medical explanation for the source of [Logsdon]'s back pain.  [Logsdon]'s pain . . . [is] of sufficient severity to subject him to the need to lie down as a pain strategy on an unpredictable basis. . . .  [I]f placed in a vocational or work environment, [Logsdon would likely] miss several days a month and/or have to go home early on an unpredictable basis and have attendance problems.

Tr. 384.  Logsdon continued seeing Dr. Wiggers, visiting his office for chronic pain follow-up appointments and to have his pain medication prescriptions refilled in July, August, September, October, November, and December 2007, Tr. 389, 388, 387-388, 386-387, 385-386, 385, and in January 2008, Tr. 443-444.

A hearing was held on Logsdon's DIB claim before an Administrative Law Judge on February 1, 2008.  Tr. 453-488.  The ALJ heard testimony from Logsdon, Tr. 458-474, 479-480, Logsdon's wife Cindy, Tr. 475-480, and a vocational expert, Tr. 481-486.  On each of the following two days, Cindy wrote a letter addressed to Logsdon's counsel "clarifying" her hearing testimony as follows:

Page 41 - OPINION AND ORDER

> Tim and I have been together for 32 years.  In that time I have never seen him
> swim.  I know for a fact that he does not know how to swim.  What he does is sit
> in a three foot deep by 12 foot round wading pool.  We have a soft sided above
> ground pool in our back yard that our grand kids play in during the summer to
> cool off in when they visit.  Tim sits in it with a blow up float ring around his
> chest.  This allows him to semi float and takes the pressure off his back, allowing
> him to relax a bit.

Tr. 180.

> Tim has lost a great deal of his inabilities [*sic*] to do the activities that he once
> enjoyed.  In the years that we have been together I have always known him to be a
> very active person.  Yet for the last couple of years the simple ability to sit at the
> kitchen table and play a card game or a game of chess, which in the past we have
> often enjoyed, has been unbearable.  Also because of his inability to sit in one
> position for any length of time, traveling has become almost impossible.  He is
> unable to go fishing on the river because he cannot stand in one place for any
> length of time without having his legs go out on him.  He has not been able to go
> deer hunting the last couple years because he can not get out and walk.  Tim has
> been an avid hunter and fisherman since he was a kid.  We are no longer able to
> go hiking which is something we had done since we have been together.  And . . .
> due to his constant back pain, it has dramatically affected our ability to have an
> intimate relationship.

Tr. 179.

Logsdon continued seeing Dr. Wiggers for chronic low back pain, having his pain

medication prescriptions refilled in February, March, April, May, June, July, August, September,

and October 2008.  Tr. 443, 442, 441, 440, 439, 438-439, 438, 437, 436-437.

On November 10, 2008, Dr. Wiggers wrote to Logsdon's legal counsel to summarize his

assessment of Logsdon's physical residual functional capacity:

> The patient had an accident in the 1980s.  He underwent a lumbar fusion in 1993.
> In 1994 he developed failed back syndrome, but was able to continue working for
> about 2½ days a week.  He had a severe worsening in 2004.  He had pain, fatigue,
> depression, headache, migraines, and muscle spasms.  He describes low back pain
> with radiating symptoms to both legs and lumbar paravertebral muscle spasms.  I
> do not believe the patient is a malingerer, but emotional factors do contribute to
> the severity of the patient's symptoms.  I think that is largely due to his loss of
> abilities, both in terms of job skills and even some activities of daily living.  He

Page 42 - OPINION AND ORDER

needs some help with dressing in the morning.  He finds that he has to lie down
approximately four times daily, from 1 to 2 hours at a time.  I think the depression
is secondary to his back pain and not primary.  He describes that he is in constant
pain, but is able to sit up for 15 minutes and stand up to 10-15 minutes.  Certainly
able to sit and stand less than 2 hours daily.  He walks with a cane and needs
frequent position changes throughout the day including supine position.  With
regards to whether the patient's leg should be elevated, he finds it helpful at times
to lie on the floor with his feet on a chair or couch to relieve some of the pain in
his low back.  I think that he should be limited to lifting and carrying 10 pounds
only occasionally, rarely 10 pounds, and should not lift items greater [*sic*] than
that.  He does not have any significant restrictions in terms of neck function or
upper extremity function.  I think it is primarily related to his low back.  He
should not twist, stoop, crouch, climb ladders, or climb stairs.  I think this
certainly affects him more than 4 days monthly; in fact, it affects him daily.

Tr. 451.  That same day, Dr. Wiggers filled out a Physical Residual Functional Capacity

Questionnaire regarding Logsdon's condition, opining that Logsdon's pain symptoms would

constantly interfere with ability to perform even simple work tasks, and that Logsdon is incapable

of even low stress jobs.  Tr. 431-435.